NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0083n.06
Case No. 24-5270

FILED
Feb 12, 2025
KELLY L. STEPHENS, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES of AMERICA,

    Plaintiff-Appellee,

v.

DUJUAN DUNLAP,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF
TENNESSEE

OPINION

Before: BATCHELDER, BUSH, and BLOOMEKATZ, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Dujuan Dunlap appeals the sentence imposed following his guilty plea for his being a felon in possession of a firearm. We AFFIRM.

**I.**

On a late Saturday night and early Sunday morning in May 2021, a number of people were congregating and socializing in the lot of a Marathon gas station and convenience store. A surveillance camera was mounted on the building above the door, aimed at the two gas pump islands in the center of the lot. The camera recorded the following events on video, without sound.

At about 1:45 a.m., Dujuan Dunlap drove a silver sedan into the lot and pulled up to the left side of the gas pump island on the left (in the video), facing the camera, as if he were going to get gas. He parked there for the next hour. At no point did he pump any gas. Over the course of that hour, cars and people came and went, but there were consistently five to ten (or more) cars crowded into the lot, and as many people milling around. In the video, Dunlap is slender with long, braided hair, a white ball cap, a white tank-top shirt, light blue jeans, and a handgun tucked

into his waistband. According to the record, Dunlap is blind in his left eye. The front seat passenger with Dunlap was Neferteri Rollins, who was wearing a denim jacket and white shorts. Over the next hour, Dunlap and Rollins fraternized with numerous people in the lot, but returned to sit in the car frequently, and occasionally went into the convenience store.

At about 2:43 a.m., there were seven cars and twelve people spread across the lot. Dunlap was standing between his car and the gas pump, next to a man leaning on the car, while Rollins stood on the other side of the car, apparently talking with Dunlap. A red four-door pickup truck with tinted windows pulled into the upper edge of the lot and stopped by the street beyond the gas-pump island on the right (at the top right corner of the video). Bobby McGuire got out of the front passenger seat, walked past (to the right of) a car parked at the right side of the gas-pump island on the right, well away from Dunlap, and walked towards the store. McGuire was wearing a black "hoodie" sweatshirt with the hood up, and black sweatpants. He had a handgun, but it was not evident in the video. As McGuire walked into the store, Dunlap wandered several feet toward the red pickup, looked at it briefly, and returned to his car.

While McGuire was in the store, Dunlap looked over at the red pickup several times, walked over and spoke with a woman near the gas-pump island on the right (whereupon she immediately walked away and left the scene), and then returned to sit in the driver's seat of his car with the door open. After about two minutes, McGuire emerged from the store and as he was walking back to the pickup along the same path he had taken to enter the store (along the right side of the lot and video), the pickup pulled out onto the street, circled left into the street (along the top of the video), and then pulled back in along the edge of the lot, stopping parallel to the street, between the two islands (at the top middle of the video), about 20 feet behind (to the left of) where it had parked originally. Apparently seeing this, McGuire altered course and walked to the left,

2

with his hands in his pockets, across the front of the lot and around the front and passenger side of Dunlap's car. It did not appear that McGuire and Dunlap had any interaction as this was happening.

But as McGuire passed the rear of Dunlap's car, Dunlap leaned out of the open driver's side door. Without ever looking back, McGuire continued walking past the pump island on a path toward the red pickup, at which point Dunlap apparently said something that caused McGuire to stop and turn around. As McGuire stood facing Dunlap, hands in his pockets with the pump island between them, Dunlap suddenly sprang from his car, gun in hand, and started shooting. He moved quickly to his right, around the gas pump, trying to get a clear shot at McGuire. As McGuire retreated to the left, Dunlap followed him around the gas pump, still shooting. McGuire, while retreating, drew his own gun to shoot back, but was hit and fell to the ground behind the passenger side of Dunlap's car. Dunlap ran around the front of his car and continued shooting at McGuire as McGuire staggered to his feet, shot back, and tried to escape behind the car parked to the left of Dunlap's car. Dunlap circled around the front of that car, still shooting and when McGuire went down again, Dunlap approached and shot him several times at close range as he lay on the ground.

During the shooting, a woman jumped from the red pickup and ran towards McGuire, but retreated into the street as Dunlap shot McGuire at close range, and only rushed to McGuire's body when Dunlap left it. The red pickup fled into the street and out of view (to the right), and the other cars and people in the lot also rapidly fled the scene. Dunlap then ran back to his car, jumped in, and sped off. Moments later, the red pickup reemerged (from the left of the screen) and stopped near McGuire's body. The male driver and a female passenger jumped out and rushed to McGuire. The driver picked up McGuire's gun and tossed it into the backseat of the pickup. Then the three

3

of them (driver and two females), with the help of a bystander, loaded McGuire's body into the pickup and drove off. McGuire was pronounced dead on arrival at the hospital.

When the police arrived at the Marathon station, they found McGuire's blood on the ground and collected several .45 caliber shell casings. On the ground where Dunlap's car had been parked, they found a cellphone with an app ("CashApp," a digital wallet) containing the username "DuJuan Dunlap." They also obtained and reviewed the surveillance video just described. Suspecting the shooter was Dunlap, detectives created a photo array to show to the two gas station employees who were present at the time of the shooting. Both of them picked Dunlap from the array, identified him as the shooter, and said he "was a regular in the store and always had a gun in his waistband."

When the police located and arrested Dunlap the next day, he had a loaded .45 caliber handgun. Ballistics testing matched that gun to a shell casing recovered at the Marathon station after the shooting.

A federal grand jury indicted Dunlap as a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924, and Dunlap pled guilty without a plea agreement. The presentence investigation report (PSR) concluded that a preponderance of the evidence showed that Dunlap had used the firearm to murder McGuire, and recommended that the district court apply the U.S.S.G. § 2A1.1(a) cross-reference for first-degree murder, which raised the offense level from 20 to 43. At sentencing, Dunlap opposed the cross-reference, arguing that he acted in self-defense and that under Tennessee law, self-defense provides a complete defense to criminal liability. The government countered that Tennessee law also requires that a person engaged in unlawful activity has a duty to retreat before using deadly force in self-defense; that Dunlap, a twice-convicted felon, was engaged in unlawful activity by possessing a firearm; and, therefore,

because he did not retreat, Dunlap could not assert self-defense. The court agreed with government and denied Dunlap's self-defense claim, but found no premeditation to support first-degree murder. Instead, the court found that Dunlap had committed second-degree murder under Tennessee law, and applied the U.S.S.G. § 2A1.2(a) cross-reference, which raised the offense level from 20 to 38.

After deducting three levels for acceptance of responsibility, the total offense level of 35 and criminal history category of IV produced an advisory range of 235 to 293 months in prison. But at that time, the statutory maximum for this § 922(g)(1) conviction was ten years, so the applicable range was 120 months. The court considered the § 3553 factors and imposed a below guidelines sentence of 110 months.

## II.

Dunlap argues that the district court misunderstood or misapplied Tennessee law when it denied his claim of self-defense; he contends that the illegal possession of a firearm is not "engaging in illegal activity" for purposes of invoking self-defense under Tennessee law.[1] This is a question of law that we review de novo. *United States v. Bradford*, 822 F. App'x 335, 338 (6th Cir. 2020); *United States v. Scheiblich*, 788 F. App'x 305, 308 (6th Cir. 2019).

The applicable provision of Tennessee's self-defense statute says: "Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if" three factors

---

[1] Dunlap also insists that the district court's "factual finding that he did not act in self-defense was clearly erroneous." But, as analyzed herein, the determinative issue in this appeal is the application of Tennessee law based on two undisputed facts (that Dunlap was a felon in possession of a firearm, and he did not retreat before using deadly force). Even if we accept Dunlap's version of every other fact, contested or otherwise, he cannot justify the killing based on self-defense under Tennessee law. Therefore, we need not reach this fact-based claim.

are met. Tenn. Code Ann. § 39-11-611(b)(2). For our purposes, we can accept that Dunlap had a right to be at the Marathon station and met the three contingent factors. On the other hand, two critical facts are not in dispute: Dunlap's possession of the firearm was unlawful, and he could have retreated but did not retreat before shooting and killing McGuire. So, streamlining and rephrasing the self-defense provision: Notwithstanding § 39-17-1322, a person who *is* engaged in illegal conduct *does have* a duty to retreat before using deadly force. *See id*.

The narrow question here is whether, for purposes of Tennessee's self-defense provision, the unlawful possession of a firearm is "illegal conduct," such that a person unlawfully in possession of a firearm has a duty to retreat before using that firearm in self-defense. And the Tennessee Supreme Court has held that it does. *Tennessee v. Perrier*, 536 S.W.3d 388, 404 (Tenn. 2017) (holding that "the defendant's possession of a firearm when he was a convicted felon amounted to engaging in unlawful activity," meaning that it was illegal conduct for purposes of the self-defense provision); *see also Tennessee v. Turner*, 2024 WL 808713, at *7 (Tenn. Crim. App. Feb. 27, 2024); *Tennessee v. Newson*, 2022 WL 2251303, at *9 (Tenn. Crim. App. June 23, 2022).[2]

Dunlap argues that the provision's opening caveat, "Notwithstanding § 39-17-1322," excludes unlawful possession of a firearm from § 39-11-611(b)(2)'s meaning of illegal conduct because § 39-17-1322 provides a defense to prosecution for firearms offenses when the firearm was used in justifiable self-defense. *See Perrier*, 536 S.W.3d at 388. But *Perrier* considered and rejected Dunlap's exact argument with respect to these statutes, explaining that § 39-17-1322

---

[2] The Tennessee Supreme Court decided *Perrier* under a prior version of T.C.A. § 39-11-611 that used the phrase "not engaged in unlawful activity." In April 2021, Tennessee amended § 39-11-611 to replace the phrase "not engaged in unlawful activity" with the phrase "not engaged in conduct that would constitute a felony or Class A misdemeanor." 2021 Tenn. Pub. Acts Ch. 115, § 3. Despite this change in language, Tennessee courts continue to recognize *Perrier*'s holding as an authoritative construction of § 39-11-611(b)(2). *See, e.g.*, *Tennessee v. Southern*, 2025 WL 338066, at *8-11 (Tenn. Crim. App. Jan. 9, 2025).

simply means that a defendant "may be acquitted of a weapons offense if a jury finds that his self-defense was justifiable." *Id.* at 404. It did not mean that "a defendant's weapons violation was not 'unlawful activity' for purposes of the self-defense statute." *Id*. at 404 n.7.

Because Dunlap, a two-time convicted felon, unlawfully armed himself, he had a duty to retreat from any confrontation with McGuire before using deadly force. Dunlap could have retreated but he did not; instead, he attacked and pursued, repeatedly shot, and ultimately executed McGuire. Under Tennessee law, T.C.A. § 39-11-611(b)(2), self-defense did not justify Dunlap's use of deadly force, and this killing would constitute second-degree murder. Consequently, the district court appropriately applied the cross reference for second-degree murder.

Dunlap also claims that his 110-month, below-guidelines sentence was "substantively unreasonable" based on his view that the district court miscalculated the advisory range by denying his claim of self-defense and applying the second-degree murder cross reference. But whether the district court correctly calculated the advisory Guidelines range (e.g., appropriately applied the § 2A1.2 cross reference to increase the offense level) is a question of *procedural* reasonableness, not substantive. *United States v. Gates*, 48 F.4th 463, 468-69 (6th Cir. 2022) ("The reasonableness inquiry has two components: procedural and substantive. . . . Procedural error occurs when the district court fails to calculate (or improperly calculates) the Guidelines range. . . ." (cleaned up)). In the preceding paragraphs, we analyzed and rejected Dunlap's challenge to the Guidelines calculation (i.e., his procedural reasonableness argument). Dunlap has not made a "substantive reasonableness" argument and we decline to make one for him.

**III.**

For the forgoing reasons, we AFFIRM the judgment of the district court.